**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

Robert L. Gaylor and
Dr. Paul Rabinowitz, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

vs.

PUBLIC COMPANY ACCOUNTING
OVERSIGHT BOARD,

        Defendants.

CLASS ACTION

JURY TRIAL DEMANDED

No. _____

---

### CLASS ACTION COMPLAINT

---

Gordon Ball
**GORDON BALL PLLC**
3728 West End Avenue
Nashville, TN 37205
Tel: (865) 525-7029
Fax: (865) 525-4679
gball@gordonball.com

*Counsel for Plaintiffs*

1

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................3

        A.  VENUE AND PERSONAL JURISDICTION .............................................3

II.     PARTIES ...........................................................................................................4

        A.  RELEVANT NON-PARTIES ..................................................................4

III.    NATURE OF ACTION .......................................................................................4

        A.  INSPECTIONS ......................................................................................5

            1.  Inspection Process. ......................................................................5

            2.  Inspection Report. ........................................................................6

        B.  MILLER ENERGY PURCHASE OF ALASKA OIL AND GAS ASSETS.......................7

        C.  PCAOB's INSPECTION OF KPMG'S AUDIT OF MILLER WAS NO INSPECTION AT
        ALL ...........................................................................................................9

        D.  A NORMAL INSPECTION COULD HAVE SEEN THAT THE ALASKAN OIL
        PURCHASE WAS AN ASSET PURCHASE ..................................................9

        E.  2017 SEC ORDER – VIOLATIONS ........................................................11

IV.     CLASS ACTION ALLEGATIONS .......................................................................16

V.      STATUTE OF LIMITATIONS ............................................................................18

VI.     COUNT ONE (BREACH OF SARBANES-OXLEY ACT OF 2002) ....................19

VII.    COUNT TWO  (BREACH OF FIDUCIARY DUTY) ............................................19

VIII.   JURY TRIAL DEMAND ....................................................................................20

IX.     PRAYER FOR RELIEF .....................................................................................20

Robert L. Gaylor and Dr. Paul Rabinowitz, ("Plaintiffs"), individually and on behalf of the class as defined hereinafter of similarly situated persons, allege the following against Defendant Public Company Accounting Oversight Board ("PCAOB"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## I.     JURISDICTION AND VENUE

The court has original jurisdiction over plaintiff's claims pursuant to the Sarbanes-Oxley Act, 15 U.S.C. §§ 7201 et. seq.

This court has original jurisdiction over plaintiff's claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1332(d)(2)(b) because the proposed class consists of 100 or more members, the amount in controversy exceeds $5,000.000 exclusive of costs and interest and at least one class member is of diverse citizenship from defendant PCAOB.

This court has jurisdiction under Article III, Section 2 of the United States Constitution and 28 U.S.C. §§ 1331, 1367 and 1651.

## A.  VENUE AND PERSONAL JURISDICTION

This court has personal jurisdiction and venue is proper because PCAOB transacts business within this district and the subject matter inspection occurred within this district.  Upon information and belief, PCAOB conducted the inspection of KPMG and Miller Energy in Knoxville, Tennessee.

3

## II.     PARTIES

Plaintiffs, Robert L. Gaylor and Dr. Paul Rabinowitz, were stockholders in Miller Energy. Plaintiffs purchased Miller Energy common stock between 2011 and 2015 and owned stock in 2015 at the time of Miller Energy bankruptcy.  Plaintiffs and plaintiffs class were members of a class in the case of *Lewis Cosby, et al v. KPMG, LLP*  certified as a national class in the Eastern District of Tennessee.  (A copy is attached hereto as Exhibit 1.)

Defendant, Public Company Accounting Oversight Board (PCAOB) is a private, nonprofit corporation created by the Sarbanes-Oxley Section 101, 15 U.S.C. § 7211 to oversee the audits of United States listed public companies.

### A.     RELEVANT NON-PARTIES

Klynveld Peat Marwiek Goerdeler ("KPMG ") is one of the "Big Four" international accounting firms, with 179 offices across 19 countries and 25,000 employees. KPMG is duly organized  and exists under the laws of the State of Delaware, with its main office at 345 Park Avenue, New York, New  York.  KPMG has an office in Knoxville, Tennessee.

Non-party Miller Energy Resources, Inc. ("Miller Energy") was an independent exploration and production company that explored for, developed, and operated oil and gas wells in south-central Alaska and Tennessee. During the Class Period, Miller Energy stock was traded on the New York Stock Exchange.

### III.     NATURE OF ACTION

1.     The PCAOB is a private-sector, nonprofit organization created by the Sarbanes-Oxley Act of 2002 to oversee auditors of public companies in order to protect investors and the

4

public interest by promoting the preparation of informative, fair and independent audit reports. The Securities and Exchange Commission oversees the PCAOB.

2. Any accounting firm that wants to audit public companies must register with PCAOB. PCAOB inspects the audits conducted by the firms. PCAOB sets standards for the profession's audits of public companies. PCAOB has the authority to inspect and discipline auditors. The investor is the client of PCAOB. PCAOB is a fiduciary to the class. PCAOB's mission is to ensure trust in the audit for the benefit of plaintiff and plaintiff's class.

## A. INSPECTIONS

3. Under the Sarbanes-Oxley Act and PCAOB Rule 4003, PCAOB annually inspects registered accounting firms that provide audit reports for more than 100 issuers. PCAOB inspection teams review work performed on audits by making selections of completed audits.

### 1. Inspection Process

4. "Select audits for review: Inspection teams select the audits and the audit areas, including non-financial areas such as independence. The inspected firm has no opportunity to limit or influence the PCAOB's selections. In selecting issuer audits for review, PCAOB generally uses both risk- based and random methods of selection, and focuses attention on audit areas believed to be of greater complexity, areas of greater significance or with a heightened risk of material misstatement to the issuer's financial statements, and areas of recurring deficiencies. The inspection team generally selects the audits most recently completed by the firm but may also select audits completed in prior years if, for example, there are no recently completed audits."

5

5.      PCAOB selected inspected KPMG's audit of Miller Energy of 2011 and according to KPMG offered no criticism of the purchase of the Alaska assets or the value placed on the Alaskan assets.

6.      "Review work papers and interview engagement team: For each audit area PCAOB selects, the inspection team reviews the engagement team's work papers and interviews engagement personnel regarding those audit areas."

7.      "Provide comment forms: If the inspection team identifies a potential deficiency, it discusses the matter with the firm and may review additional audit documentation. If the inspection team still believes that a potential deficiency exists after its discussion with the firm and review of any additional audit documentation, it will provide the firm with a written comment form on the matter. The firm is allowed the opportunity to provide a written response to the comment form."

**2.  Inspection Report**

8.      A PCAOB inspection results in an inspection report.  The report may include certain deficiencies that relate to instances of non-compliance with PCAOB standards or rules other than those where the firm had not obtained sufficient appropriate audit evidence to support its opinion(s).

9.      The inspection team may refer matters, where appropriate, to the PCAOB's Division of Enforcement and Investigations and/or – consistent with requirements of the Sarbanes-Oxley Act and PCAOB Rule4004 – to the Securities and Exchange Commission or other appropriate regulatory or law enforcement authorities (federal, state, or foreign).

10.     As part of PCAOB enforcement of its auditing standards, they perform an audit of selection of audits of the CPA firms that are permitted to perform the annual audits of publicly traded companies. In the case of KPMG, the initial audit of Miller Energy, Inc for the year ended April 30, 2011 and was selected by PCAOB. That year PCAOB selected 52 audits of KPMG to do their audit.  PCAOB does not use a random selection process to select these 52 companies. PCAOB states that their process is skewed to select companies that are high risk and including areas of accounting that have issues as to misstatement of financial statements to investors.  The bargain purchase gain and the related valuation of its Oil and Gas reserves, by hundreds of millions of dollars, was the transaction that got Miller Energy, Inc. audit selected by PCAOB.

11.     This case is about the intentional or reckless failure of the PCAOB to properly inspect and report to the Securities and Exchange Commission (SEC) the true value of the Alaskan assets in KMPG's 2011 audit of Miller.  The failure of PCAOB's inspection caused the plaintiff and plaintiff class to lose millions of dollars.  Upon information and belief, PCAOB inspected KPMG's audit of Miller's financial statements for 2011, the first audit KPMG performed of Miller's financial statements, and had no criticisms or comments about the oil and gas properties, their valuation or KPMG's audit work.  The oil and gas assets valuation comprised over 97% of the total assets of Miller Energy.

**B.     MILLER ENERGY PURCHASE OF ALASKA OIL AND GAS ASSETS**

12.     The Security and Exchange Commission (SEC) in 2017 found that Miller Energy and KPMG engaged in financial accounting and reporting fraud, as well as audit failures, related to the valuation of certain oil and gas assets in Alaska (Alaska Assets) acquired by Miller Energy. Miller Energy, an oil and gas company headquartered in Knoxville, Tennessee, purchased these

assets for $ 2.25 million in cash - along with the assumptions of certain liabilities it valued at approximately $ 2 million - during a competitive bid in a bankruptcy proceeding in December 2009. Miller Energy subsequently reported these assets at an overstated value of $ 480 million and recognized a one-time "bargain purchase" gain of $ 271 million for the fiscal third quarter ended January 2010 and the fiscal year ended April 2010. Miller Energy and the previous auditors (Sherb) consistently described in 10-Q, 10-K, legal closing documents and news releases to the public that the acquisition of the Alaska Assets was a purchase of assets. The accounting for purchase of any asset is limited to the fair value of the assets acquired to the actual consideration paid and liabilities assumed which in this case is $ 4.25 million. What Miller Energy did was a misapplication of a change in a "business combination transaction  accounting" which allows, in a very limited number of cases, to recognize assets of an operating business acquired at fair value at more than what was paid which could create a bargain purchase. Miller Energy used a non-fair value calculation for a required SEC disclosure to record a fraudulent valuation and gain.

13.     When KPMG replaced Miller Energy's former auditor in 2011, KPMG was required to satisfy themselves as to the value of the Alaska Assets and the bargain purchase gain. KPMG discovered the fraud but encouraged Miller Energy to change footnotes in the 2011 audit to describe the purchase of the Alaska Assets to reflect a "business combination".

14.     PCAOB should have determined that the purchase of the oil field assets was a true asset acquisition and that no bargain purchase gain could have been shown.  Because the PCAOB did not alert the SEC to the fraud of KPMG and Miller the SEC did not discover the fraud until 2017.

8

**C. PCAOB's INSPECTION OF KPMG'S AUDIT OF MILLER WAS NO INSPECTION AT ALL**

15.     The failure of PCAOB' to properly inspect and report to SEC immediately after the KPMG/Miller audit allowed Miller Energy to defraud the plaintiff and plaintiff's class until Miller's bankruptcy in 2015.

16.     The overstatement of the Alaska Assets was by far the single most important event in Miller Energy's history; transforming it from a penny-stock company trading on the pink sheets, to one traded on the New York Stock Exchange ("NYSE"), with a stock price reaching nearly $9 per share. The SEC in 2017 stated that the Alaska Assets were overvalued by more than $400 million. The Alaska Asset was 97.5% of Millers' total assets.

17.     PCAOB's failure to find KPMG's and Miller's fraud during its inspection and not reporting the correct results to the SEC directly caused the millions of dollars of losses to the plaintiffs from the time of the inspection until the Miller bankruptcy in 2015.

**D. A NORMAL INSPECTION COULD HAVE SEEN THAT THE ALASKAN OIL PURCHASE WAS AN ASSET PURCHASE**

18.     In an email dated January 6, 2011, Lynne A. Lamkin alerted John Riordan to the fact that Miller's 10-Ks called the purchase an asset acquisition before they became Miller's auditor. Based upon facts and opinions, KPMG should have determined that the purchase of assets was a true asset acquisition, and that no bargain purchase gain could be shown. With the high write-up of the reserves, KPMG should have considered Miller a high-risk client and not accepted the engagement. Riordan and KPMG classified Miller as a medium risk, even though the new purchase represented 95% of their total assets, and assets increased 5000% after the purchase.

9

1. Miller's Registration Statement for fiscal years 2009-2010 states "Acquisition of Alaskan Assets of Pacific Energy Resources (not purchasing PER).

2. The footnote on the financial statements (April 30, 2010) called the transaction a purchase of assets. Same on Form 8-K (3-29-2010). "The resulting assets and liabilities were deemed not to have been a separate business for purposes of preparing pro forma financials." Same language was on the Form 8-K/A,12/10/2009.

3. A SEC letter dated June 7, 2011, made these damming observations:

   - In November 2009, certain assets of Pacific Energy were permitted by the bankruptcy court to be sold in pieces.
   - The Pacific Energy administration and accounting staff had largely been dismantled as of October 2009.
   - The Alaska oil and gas wells had ceased production by August 31, 2009, and had not been fully operational for months.
   - Several of the wells had become inoperable, as the well casing had collapsed and required rework.
   - Your Osprey offshore drilling platform ceased production in July 2009, was missing parts, inoperative, and none of the oil wells supported by the offshore drilling platform could resume production without substantial investment. Sherb Audit 10-K said it would take $35 million to get Ospery back into operation.
   - Form 8-KA, December 10-2009: "Therefore, the resulting assets and liabilities were deemed not to have been a separate business for purposes of preparing proforma financial results "
   - Critical to the elements process/output was Miller's lack of experience as well as the Cook Inlet management teams' deficiencies.
   - Miller had no oil experience in Alaska.
   - Miller had no oil experience over water and/or deep wells.
   - Miller's previous experience was small shallow wells in Eastern Tennessee near oil fields.
   - The Cook Inlet management team were the same people that had failed the previous owners attempts to produce cash flow from their oil fields (output).
   - Cash flow and financing were needed in order to obtain any significant outputs:
   - The December 10, 2010, R. E. Davis Projection of Cash Flows for the Cook Inlet PV-10 Report Projected Cash Flow Requirements for Capital Investment of
     Y/E 12-2010      $33,300,000
     Y/E 12-2011      $55,600,000

10

Y/E 12-2012     $ 9,200,000
Y/E 12-2013     $23,675,000

- Miller did not have financing until May 2011 and funding only after KPMG audit report was released. Only $35,000,000 available of the $115,000,000. Guggenheim had all assets tied up.

19.     KPMG caused Miller Energy to change the 2010 10-Ks from an asset purchase to a business combination in the 2011 10-K.

20.     If PCAOB had fulfilled its responsibility to the investors of Miller Energy in 2011 PCAOB had several avenues to make this fraud public early on. If PCAOB had found the asset and accounting errors they are required to notify the SEC. PCAOB did not explore restatements of previously reported financial statements and changes to previously issued audit reports by KPMG. PCAOB could have issued timely public reports and press release issuing finds and/lor sanctions against the firm of KPMG. None of that ever happened. Even after the SEC issued fines and forfeitures in the millions of dollars against KPMG and Miller, PCAOB sat on their hands concerned that if they were to do so that someone might point out that they had failed to uncover the earlier flawed audit in 2011.

21.     As of September 29, 2015, Miller Energy had approximately 46.7 million shares of common stock outstanding and 6.7 million shares of preferred stock outstanding. On September 11, 2015, the Company caused its common and preferred stock to be de-listed from the NYSE. On October 1, 2015, the Company filed a petition seeking relief under federal bankruptcy statutes.

**E.     2017 SEC ORDER – VIOLATIONS**
       (Copy of Order attached hereto as Exhibit 2)

*Rule 102(e) and Section 4C of the Exchange Act*

1. KPMG's 2011 audit and 2011 third quarter review were deficient and not performed in

11

accordance with PCAOB standards. Section 4C(b) of the Exchange Act and Rule 102(e)(1)(iv) define improper professional conduct with respect to persons licensed to practice as accountants as (1) a single instance of highly unreasonable conduct in circumstances for which heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct that indicate a lack of competence to practice before the Commission.

2. As a result of the conduct described above, KPMG and Riordan engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice. Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) provide, in pertinent part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in improper professional conduct.

3. As set forth above, KPMG and Riordan should have known that Miller Energy's financial statements were not in accordance with GAAP. They knew that the two reports the company relied on to substantiate the fair value of the Alaska Assets were not fair value estimates that were appropriate for financial reporting purposes. They should have known that the inclusion of the numbers in the insurance report double counted as much as $110 million worth of the fixed assets. Moreover, throughout the 3Q2011 review and fiscal 2011 audit, KPMG and Riordan were aware of the company's inadequate accounting staff, ineffectual internal controls, and management's possible incentive to overstate the value of the Alaska Assets. During the review and audit, they should have been aware of the understated forecasted costs in the reserve report. Yet KPMG and Riordan failed to take reasonable steps to determine that the company's valuation for its Alaska acquisition was properly recorded pursuant to applicable GAAP.

*Failure to Properly Plan the Audit (AU §§ 311 and 312)*

4. In planning the audit, PCAOB standards state that an auditor should consider the nature, extent and timing of work to be performed in planning the audit and should prepare a written audit program which sets forth in reasonable detail the audit procedures necessary to accomplish the audit objectives. AU § 311.05. Auditors must also consider audit risk and materiality in planning the audit and designing audit procedures. AU § 312.12. In doing so, they should plan the audit so that audit risk will be limited to a low level appropriate for expressing an opinion on the financial statements. AU § 312.13. Auditors are also required to consider identified significant risks of material misstatement of the financial statements in: (1) determining the nature, timing or extent of procedures; (2) assigning staff; or (3) requiring appropriate levels of supervision. AU § 312.17.

5. As a result of the conduct described above, KPMG and Riordan failed to adequately plan the audit of Miller Energy's fiscal 2011 financial statements in accordance with professional standards.

*Failure to Exercise Due Professional Care*
*and Professional Skepticism (AU §§ 230, 316 and 722)*

6. PCAOB standards require auditors to exercise due professional care in the planning and performance of the audit and the preparation of the report. AU § 230.01. Auditors are required to maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." AU § 230.07. In addition, the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process." AU § 230.08. In exercising professional skepticism, an auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. AU §§ 230.09 and 316.13. Further, auditors should: (1) perform an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred; and (2) conduct the engagement with a mindset that recognizes that a material misstatement due to fraud could be present, regardless of past experience with the entity and the auditors' belief about management's honesty and integrity. AU § 316.13. Auditors should also exercise due professional care and professional skepticism in the course of reviews of interim financial information. AU § 722.01 (noting that the three general standards discussed in AU § 150 apply to interim reviews); see also AU § 150.02.

7. As a result of the conduct described above, KPMG and Riordan failed to exercise due professional care and an attitude of professional skepticism in its 3Q2011 review and 2011 audit of Miller Energy.

*Failure to Properly Test Fair Value Measurements and Disclosures and*
*Using the Work of a Specialist (AU §§ 328, 342 and 336)*

8. AU § 328 requires auditors to obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP. AU § 328.03. The standard provides that "[t]he auditor should test the data used to develop the fair value measurements and disclosures and evaluate whether the fair value measurements have been properly determined from such data and management's assumptions." This includes "whether the data on which the fair value measurements are based, including the data used in the work of a specialist, is accurate, complete and relevant . . . ." AU § 328.39. In addition, "[t]he auditor should evaluate the sufficiency and competence of the audit evidence obtained from auditing fair value measurements and disclosures as well as the consistency of that evidence with other audit evidence obtained and evaluated during the audit." AU § 328.47; see also AU § 342.07 (the auditor's objective is, inter alia, to obtain sufficient competent evidential matter to provide reasonable assurance the accounting estimates are presented in conformity with applicable accounting principles). If a valuation model is used, the auditor reviews the model and evaluates whether the

13

assumptions used are reasonable. AU § 328.40.

9.  In addition, AU § 336 provides guidance to auditors when they seek to use the work of a specialist as evidential matter to support financial statement assertions. Among other items, the standard requires the auditor to evaluate the professional qualifications of the specialist to determine that he or she possesses the necessary skill and knowledge in the type of work under consideration. See AU § 336.08. It also provides that the auditor should obtain an understanding of the nature, scope, and objectives of the work performed by the specialist, including the appropriateness of using the specialist's work for the intended purpose. See AU § 336.09. In addition, AU § 336.12 states that an auditor should evaluate the appropriateness and reasonableness of the specialist's methods and assumptions by: (a) obtaining an understanding of those methods and assumptions; (b) making appropriate tests of data provided to the specialist; and (c) evaluating whether the specialist's findings support the related assertions in the financial statements.

10. As a result of the conduct described above, KPMG and Riordan failed to comply with these professional standards in connection with testing Miller Energy's fair value assertions for the Alaska Assets. KPMG and Riordan departed from AU § 328 by, among other things, failing to sufficiently evaluate the reasonableness of management's assumptions and by failing to test the reliability of the information used in the preparation of the reports used for valuing the properties. KPMG and Riordan also departed from AU § 336 by, among other things, failing to appropriately test the data provided to the specialists.

*Failure to Obtain Sufficient Competent Evidential Matter (AU §§ 315 and 326)*

11. Under AU § 315.12, "[t]he successor auditor must obtain sufficient competent evidential matter to afford a reasonable basis for expressing an opinion on the financial statements he or she has been engaged to audit." Obtaining audit evidence to analyze the impact of the opening balances on the current-year financial statements may include applying appropriate auditing procedures to account balances at the beginning of the period under audit and to transactions in prior periods. Id. "Evidential matter" includes the underlying accounting data and all corroborating information available to the auditor. AU § 326.15. To be "competent," evidence must be both valid and relevant. AU § 326.21. For it to be "sufficient," the evidence must be "persuasive." AU § 326.22. In evaluating evidential matter, the auditor must consider whether the specific audit objectives have been achieved. AU § 326.25. In doing so, he or she makes an "unbiased" evaluation and considers "relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements." Id. If there is substantial doubt, the auditor must refrain from forming an opinion until additional evidential matter can be obtained to remove such doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. Id.

12. As a result of the conduct described above, KPMG and Riordan failed to obtain sufficient competent evidence supporting the assertions in Miller Energy's fiscal 2011 financial

14

statements concerning the fair value of the acquired Alaska Assets.

*Failure to Supervise the Engagement Team Properly (AU § 311)*

13. PCAOB standards note that audit "assistants," including firm personnel other than the auditor with final responsibility for the audit, are to be "properly supervised." AU §§ 311.01. Those standards further require that assistants be informed of their responsibilities and the objectives of procedures assigned to them, and that the work of assistants be reviewed to determine whether that work was adequately performed. AU §§ 311.12 and 311.13.

14. As a result of the conduct described above, KPMG and Riordan failed to properly supervise the engagement team in connection with its 2011 Miller Energy engagement.

*Failure to Prepare Required Documentation (AS 3)*

15. PCAOB standards mandate that an auditor's documentation contain sufficient information to enable an experienced auditor, having no previous connection to the engagement to: (1) understand the nature, timing, extent and results of the procedures performed, evidence obtained and conclusions reached; and (2) determine who performed the work and the date such work was completed as well as the person who reviewed the work and the date of such review. AS 3.1, 3.6. Auditors are also required to document significant findings and issues, including the actions taken to address them and the basis for the conclusions reached. AS 3.12.

16. As a result of the conduct described above, KPMG and Riordan failed to prepare and retain required audit documentation in sufficient detail to provide a clear understanding of its purpose, source, and conclusions reached in connection with its 2011 Miller Energy engagement.

*Failure to Issue an Accurate Audit Report (AU § 508)*

17. Under AU § 508, an auditor may only express an unqualified opinion on historical financial statements when the auditor has formed such an opinion on the basis of an audit performed in accordance with PCAOB standards. AU § 508.07. Based upon the departures from PCAOB auditing standards discussed above, KPMG should not have issued an audit report containing an unqualified opinion on Miller Energy's fiscal year 2011 financial statements.

*Failure to Perform Adequate Personnel Management (QC 20 and 40)*

18. PCAOB Quality Control Standards require an auditing firm to establish policies and procedures which provide the firm with reasonable assurance that work is assigned to personnel having the degree of technical training and proficiency required in the circumstances. See QC 20.13 and QC 40.02.

19. These standards also require the firm to establish policies specifically designed to address the competencies of audit partners, including a requirement that practitioners-in-charge of an engagement possess an understanding of the industries in which their clients operate. See QC 40.08. When the client's business involves unique and complex accounting, as in the case of the oil and gas industry, the need for the engagement partner to understand the client's industry is even more important.

20. As a result of the conduct described above, KPMG failed to meet the standard that required the partner-in-charge to be competent and have the degree of technical training and proficiency required in the circumstances.

*Failure Related to Adequate Competency and Proficiency*
*(AU §§ 210 and 161, QC 20)*

21. PCAOB standards require that the audit be performed by "a person or persons having adequate technical training and proficiency as an auditor." AU § 210.01. Likewise, PCAOB Quality Control standards require that "[p]olicies and procedures should be established to provide the firm with reasonable assurance that the work performed by engagement personnel meets applicable professional standards, regulatory requirements, and the firm's standards of quality." QC 20.17. Firm policies and procedures should also provide reasonable assurance that the policies and procedures established for the elements of quality controls described in the standard are "suitably designed and are being effectively applied." QC 20.20; see also AU § 161.

22. As a result of the conduct described above, KPMG failed to meet the standard that required competency and proficiency in staffing the fiscal 2011 Miller Energy audit.

## IV.    CLASS ACTION ALLEGATIONS

22. Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a)

and 23(b) on their own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased Miller Energy common and preferred stock between December 2011 and October 1, 2015 (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

16

23. The class identified above collectively referred to as the "Class" and the periods of time applicable to the Class is collectively referred to as the "Class Period".

24. Specifically excluded from the Class are PCAOB, the officers, directors, or employees of PCAOB; any entity in which PCAOB has a controlling interest; and any affiliate, legal representative, heir or assign of PCAOB. Also excluded from this Class is any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

25. Class Identity: The Class is ascertainable and is one for which records exist.

26. Numerosity: Plaintiffs do not know the exact number of class members but plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

27. Typicality: Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs purchased Miller Energy common and preferred stock during the class period and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

28. Common Questions Predominate: There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

     a. Whether Plaintiffs and members of the Class have been damaged by PCAOB's conduct;

     b. The amount of any damages.

17

29.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class who purchased Miller stock and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

30.    Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the class is impractical.  Prosecution as a class action will eliminate the possibility of duplicative litigation.  Individual litigation resents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

31.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for PCAOB.

**V.    STATUTE OF LIMITATIONS**

32.    The claims of Plaintiffs and members of the Class are timely brought because of the application of the discovery rule, the continuing violation doctrine, and the equitable tolling doctrine.

33.    PCAOB's conduct and failure to inform the SEC is a continuing violation of the Sarbanes-Oxley Act.   (See Exhibit 3, Memorandum Opinion of August 2018 of *Cosby v. KPMG*.)

18

## VI.    COUNT ONE (BREACH OF SARBANES-OXLEY ACT OF 2002)

34.    Plaintiffs and plaintiffs' class repeat and reallege each and every allegation contained in paragraphs 1-33 as if fully set forth herein.

35.    Plaintiffs bring this claim individually and on behalf of the members of the class against defendant, PCAOB.

36.    PCAOB either negligently, recklessly or intentionally failed to properly audit the KPMG 2011 audit of Miller Energy thereby causing plaintiffs and plaintiffs' class damage. PCAOB's complete failure led to Miller Energy's continuance as a public company until 2015 when Miller filed bankruptcy.

## VII.    COUNT TWO  (BREACH OF FIDUCIARY DUTY)

37.    Plaintiffs and plaintiffs' class repeat and reallege each and every allegation contained in paragraphs 1-36 as if fully set forth herein.

38.    Plaintiffs and plaintiffs' class bring this claim individually and on behalf of the members of the class against defendant.  PCAOB has a fiduciary duty to plaintiffs and plaintiffs' class.

39.    The PCAOB is a nonprofit corporation established by Congress to oversee the audits of public companies in order to protect investors and further the public interest in the preparation of informative, accurate and independent audit reports.  The PCAOB can sue and be sued under the Sarbanes-Osley Act.  A fiduciary duty is defined as a duty to act with the highest degree of honesty and loyalty toward another person or class of persons.  PCAOB's mission is to ensure trust in the audit to the investors and the public.  The investor protection part of the Sarbanes-Oxley Act fell to the PCAOB to implement.  PCAOB has failed to protect the plaintiffs

19

and plaintiffs' class as alleged herein. PCAOB is the ultimate gatekeeper to protect the investor and the public.

40.     PCAOB's conduct violated PCAOB's public duty to give the SEC and the public proper and accurate information for the benefit of the plaintiffs and plaintiffs' class.

**VIII.   JURY TRIAL DEMAND**

41.     Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all of the claims asserted in this complaint so triable.

**IX.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.  This action may proceed as a class action, with Plaintiffs as the designated representatives and Plaintiffs' counsel designated as interim class counsel;

B.  Plaintiffs and the members of the class recover damages sustained by them as provided by law;

C.  Plaintiffs and the members of the class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.  Plaintiffs and members of the class recover the costs of this suit, including reasonable attorneys' fees as provided by law; and

E.  Plaintiffs and members of the class receive such other and further relief as may be just and proper.

20

Respectfully submitted, this 8th day of May 2024.

/s/Gordon Ball
Gordon Ball
**GORDON BALL PLLC**
3728 West End Avenue
Nashville, TN  37205
Tel:  (865) 525-7029
Fax: (865) 525-4679
gball@gordonball.com

21